# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

              Plaintiff,

      v.

JOHN MARK FELTON,

           Defendant.

CASE NO. 3:09-CR-00124-RRB-DMS

**FINAL REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS OF NOVEMBER 17 AND 18 2009 AND ALLEGED CONSENTS ON THE SAME DATES, FOR VIOLATION OF RULE 5, FEDERAL RULES OF CRIMINAL PROCEDURE**
**[Doc. 33]**

## I. MOTION PRESENTED

Defendant John Mark Felton (hereafter Felton) has been charged with one count of interstate travel with intent to engage in a sexual act with a child under the age of twelve in violation of 18 U.S.C. § 2241.

In this motion at Docket 33, Felton moves to suppress all statements attributed to him on November 17, 2009 and before 1:33 p.m. on November 18, 2009 and all alleged consents to search given on those two dates, as well as any fruits of that evidence. He argues that these things should be suppressed because they were obtained during an unnecessary delay in getting him in front of a magistrate judge for an initial appearance in violation of Rule 5(a) of the Federal Rules of Criminal Procedure.

The Government opposes the motion. It argues that Felton's Miranda waivers act as a waiver of his Rule 5(a) right to be promptly brought in front of a magistrate upon arrest. It also

1

argues that the delay in this case was not unreasonable or unnecessary in that it was due to procedural court delays and was not deliberately created to allow the agents more time to talk to Felton without a lawyer.

## II. FINDINGS OF FACT

Felton was arrested and interrogated on November 16, 2009. The facts surrounding Felton's initial encounter with law enforcement agents on November 16, 2009 are set forth in more detail in this Court's Report and Recommendation on Felton's motion at Docket 39 (Motion to Suppress Statements due to Miranda violations) and do not need to be repeated in full for this motion, as it directed solely to the issue of what happened on November 17, 2009 and November 18, 2009 leading up to his initial appearance on November 18 at 1:30 p.m. The facts in this Report and Recommendation focus on what happened between Felton's arrest and his initial appearance on November 18, 2009.

### A. November 16, 2009

The basis of the charge against Felton stems from the allegation that Felton was the author of various internet chats that with "Kirby," who was actually Special Agent Kevin Laws acting in an undercover capacity as the father of a six-year-old boy and a seven-year-old girl. These chats allegedly detail the author's plan to travel to Alaska to have sexual relations with Kirby's six-year-old boy.

Felton arrived at the Anchorage airport at 10:36 p.m. (Tr. Vol. 1 at 52, 142). Federal agents were awaiting his arrival and had him under surveillance. Felton quickly deplaned with one backpack and, after a short stop at the restroom, proceeded to the baggage claim to wait for his one checked bag. (Tr. Vol. 1 at 83, 188). Special Agent Dean Wauson with the U.S.

2

Immigration and Customs Enforcement (ICE) and Alaska State Trooper Nathan Bucknall approached him. (Tr. Vol. 1 at 81, 143, 189). Agent Wauson told Felton he was a federal agent and asked if Felton would accompany them to a private location to talk. (Tr. Vol. 1 at 143, 190). Felton agreed to accompany them without questions. (Tr. Vol. 1 at 54, 84, 143, 190). Felton had to leave his checked bag behind and other agents kept it. (Tr. Vol. 1 at 144). He was allowed to bring his backpack with him. Agent Wauson testified that although they asked Felton to voluntarily accompany them, he would not have been free to leave if he had denied their request. (Tr. Vol. 2 at 46-47).

The officials took Felton to the airport security offices located one level above the baggage claim. They had to wait a couple minutes while the door to the security offices was opened for them. (Tr. Vol. 1 at 144, 190). Once opened, they took Felton into an interview room. It was a small room with two desks inside of it. Felton, Trooper Bucknall, and Agent Wauson all went inside.

At this point it was approximately 11:00 p.m., give or take a few minutes. (Tr. Vol. 1 at 145,180; Gov. Ex. 13). Felton was read his Miranda rights and signed a waiver of those rights. He was interviewed for about an hour and a half. At the end of the interview, Felton asked Agent Wauson how he could find a respectable attorney. (Tr. Vol. 1 at 156; Tr. Vol. 2 at 6). Agent Wauson testified that he believed Felton was asking how to find a reputable attorney that would not take advantage of his economic status. (Tr. Vol. 2 at 6-7). Agent Wauson told Felton that some attorneys would simply take his money to buy a boat and stressed to Felton that their case against him was strong. (Tr. Vol. 2 at 6-7; Def. Ex. B at 163). He was transported to the Anchorage jail at about 12:45 a.m. on November 17, 2009.

3

**B. November 17, 2009**

At 8:08 a.m. on November 17, 2009, Agent Wauson submitted a notification of Felton's arrest to the Clerk of Court for the District of Alaska. (Gov. Ex. 2). The clerk's office emailed Agent Wauson to confirm its receipt of the arrest notice. The email stated that the notice was received and that the arrest would be processed once a charging document was received. (Gov. Ex. 3). It is not clear from the evidence on record what all transpired regarding the drafting and filing of the charging document that day. Agent Kevin Laws was in charge of this step. (Tr. Vol. 2 at 92). Agent Wauson testified that he did not know when Agent Laws prepared the complaint or when he took it to the judge's chambers for execution. (Tr. Vol. 2 at 92). Based on the evidence and the parties' stipulations, the Court finds as follows:

1) The complaint was docketed in the court's electronic filing system at 4:54 p.m. on November 17, 2009 by a staff member from the clerk's office (Gov. Ex. 6; Tr. Vol. 2 at 130);

2) The complaint itself does not have a time stamp to indicate when it was signed by the judge (Tr. Vol. 2 at 132);

3) Once the judge signed the complaint, it is in the judicial assistant's control, and the judicial assistant takes the complaint to the clerk's office for processing (Tr. Vol.2 at 133);

4) The judicial assistant does not have an individual recollection of when the complaint was signed and when she brought it up to the clerk's office (Tr. Vol. 2 at 132-133);

5) An order setting the initial appearance was docketed in the court's electronic

4

filing system at 4:56 p.m. on November 17, 2009 by a staff member from the clerk's office (Gov. Ex. 7; Tr. Vol. 2 at 131);

6) The initial appearance was originally set for November 18, 2009 at 11:30 a.m. (Gov. Ex. 7);

7) An amended order changing the time for the initial appearance was docketed at 5:06 p.m. on November 17, 2009 by the judge's judicial assistant (Gov. Ex. 8; Tr. Vol. 2 at 131);

8) The amended order reset the initial appearance from 11:30 a.m. to 1:30 p.m. on November 18, 2009 (Gov. Ex. 8).

9) No one from the Government or acting on behalf of the Government contacted the judge or the clerk's office with regard to the specific date and time in the scheduling of the initial appearance or the rescheduling of the initial appearance by the judicial assistant. No one from the Government or acting on behalf of the Government called requesting that the initial appearance be scheduled earlier (Tr. Vol. 2 at 133-134);

10) Agent Wauson testified that the initial appearance was not synchronized for any particular purpose (Tr. Vol. 2 at 92).

Later that day, at about 3:15 p.m., before the complaint had been filed or the initial appearance set, Agent Wauson went to the Anchorage jail in order to seek Felton's consent to examine the electronic media that was found in a silver suitcase in Felton's Boston home pursuant to a search warrant. (Tr. Vol. 2 at 13). He testified that this interview was not planned in concert with any action Agent Laws was taking in regards to the filing of the complaint. (Tr.

5

Vol. 2 at 92).

Wauson went to the jail with Special Agent Matthew Kimmel from ICE. (Tr. Vol. 2 at 14). Agent Wauson testified that the first thing he did upon sitting down with Felton in the Anchorage jail was to tell Felton that he had located the phone number for Felton's immigration attorney from documents they received from his immigration file earlier that day. (Tr. Vol. 2 at 14-15; Gov. Ex. 14). Wauson thought Felton was having trouble locating it the night before. But Felton indicated that he had written the number down. (Tr. Vol. 2 at 15).

Wauson then proceeded to tell Felton that they wanted to ask him more questions but explained that they had to read him his rights again. (Tr. Vol. 2 at 16, 117-118). Wauson read Felton his Miranda rights from the Statement of Rights form and Felton read and signed the form. (Tr. Vol. 2 at 16; Gov. Ex. 4). Agent Wauson explained to Felton that agents in Boston had searched his home and found a silver suitcase. (Tr. Vol. 2 at 17). He told Felton that there were various DVDs in the suitcase. (Tr. Vol. 2 at 17). Felton told Wauson that there was child pornography on those DVDs. (Tr. Vol. 2 at 18). He told Wauson that when he had purchased the videos, he thought the boys depicted were over the age of 16, but upon viewing them he realized that the boys were much younger. (Tr. Vol. 2 at 18).

Wauson then asked for Felton's consent to search the DVDs and the contents of the silver suitcase. He presented Felton with a consent form. (Tr. Vol. 2 at 18; Gov. Ex. 5). Felton signed the consent at 3:45 p.m. (Gov. Ex. 5).

During this second encounter, Felton also told the agents that he had some sleeping pills in his suitcase and he wanted to make sure they knew the pills were not for the boy. He said he brought them in order to drug Kirby if the encounter turned bad. (Tr. Vol. 2 at 25; Def. Ex. A at

6

4). This comment was not made in response to any question by the agents. Felton volunteered the information. (Tr. Vol. 2 at 25; Tr. Vol. 1 at 121).

Felton then told Agent Wauson he was having difficulty using the phones at the Anchorage jail. (Tr. Vol. 2 at 22). He could not place long distance calls from the jail. (Tr. Vol. 1 at 124). Wauson took Felton to the ICE offices so that Felton could make phone calls. (Tr. Vol. 2 at 22). They did not place any parameters on who he could call or how many calls he could make. (Tr. Vol. 2 at 22-23). Felton made a phone call to his partner in Boston. Agent Wauson testified that he told his partner what was going on and that the agents with Homeland Security had been cooperative and were treating him well. (Tr. Vol. 2 at 23-24). The encounter ended after Felton made his phone call.

## C. November 18, 2009

On November 18, 2009 at about 11:30 a.m. Agent Wauson went to talk to Felton a third time. As noted above, Felton's initial appearance was set for 1:30 p.m. that day. (Gov. Ex. 8). Agent Wauson testified that they went to the jail to prepare Felton for transport to the courthouse and to get another consent to search. (Tr. Vol. 2 at 26-27). Agent Kimmel was present during this third encounter. Agent Kimmel testified that there was no discussion about having to get Felton's consent before the initial appearance. (Tr. Vol. 2 at 126).

Agent Wauson began again by reading Felton his Miranda rights and presented Felton with a waiver form to sign. (Tr. Vol. 2 at 29). Felton was given the form to review and signed the form. (Gov. Ex. 9). Agent Wauson then asked Felton for his consent to search the items that he had brought with him to Alaska. The agents had already received Felton's verbal consent to search the laptop he brought with him but the agents wanted to get it in writing and wanted to get

7

consent to search his luggage and backpack. (Tr. Vol. 2 at 27). They presented him with a consent to search form. (Tr. Vol. 2 at 30). Felton gave his verbal consent and then signed the form. (Tr. Vol. 2 at 30; Gov. Ex. 10).

Agent Wauson testified that ICE has an inventory search policy for any items that they are holding in their safekeeping. (Tr. Vol. 2 at 30). The policy is that ICE agents conduct an inventory search of the items being held by the Government so that they have an accurate inventory of what is in their possession and whether those items are valuable or dangerous. (Tr. Vol. 2 at 31). In this case, Agent Wauson testified that he did not have a concern about dangerous items in Felton's carry-on bag since it had gone through TSA screening. (Tr. Vol. 2 at 31). He testified that they did not conduct an inventory search of Felton's luggage because they were planning on seeking consent or judicial permission to search for evidence in those places. (Tr. Vol. 2 at 32). But he testified that if they had not obtained permission, eventually they would have been obliged to conduct an inventory search pursuant to their policy in order to identify what is in their possession and whether anything is particularly dangerous or valuable. (Tr. Vol. 2 at 32-33).

### III. DISCUSSION

#### A. Rule 5 and the prompt presentation requirement

Felton contends that the delay between his arrest and his initial appearance violated Rule 5(a) of the Federal Rules of Criminal Procedure. The rule requires that a person making an arrest within the United States must take the defendant "without unnecessary delay" before a magistrate judge. Fed. R. Crim. P. 5(a).

Even before the enactment of Rule 5, the obligation of an officer to promptly bring a

8

person arrested before a magistrate was a common law right that was codified in a number of federal statutes. United States v. Garcia-Hernandez, 569 F.3d 1100, 1104 (9th Cir. 2009). In McNabb v. United States, 318 U.S. 332 (1943), the Supreme Court held that, as part of its supervisory powers, federal courts should enforce this prompt presentation requirement by suppressing a defendant's confession if it was made after an unreasonable presentment delay. Garcia-Hernandez, 569 F.3d at 1104. The Court in McNabb reasoned that this requirement prevents officers from giving arrested suspects the third degree. McNabb, 318 U.S. at 344. "The third degree refers to the 'process of extracting a confession or information from a suspect or prisoner by prolonged questioning, the use of threats, or physical torture.'" Garcia-Hernandez, 569 F.3d at 1104 n.2 (quoting Black's Law Dictionary 1518 (8th ed.)).

Rule 5 was enacted a few years after the Supreme Court's ruling in McNabb, to place the presentation requirements in the criminal rules. As state above, it requires that a defendant be brought to a magistrate without unreasonable delay. In United States v. Mallory, 354 U.S. 449 (1957), the Supreme Court applied Rule 5(a) and held that to properly enforce the rule, a confession which had been made seven hours after an arrest was inadmissible due to unnecessary delay.

Based on what is known as the *McNabb-Mallory* rule, the consequence of violating Rule 5's prompt presentation requirement is suppression of any confession made during that period of unreasonable delay. However, in 1968, Congress modified the *McNabb-Mallory* rule by enacting 18 U.S.C. § 3501(c). Corley v. United States, 129 S.Ct. 1558, 1563-64 (2009) (holding that § 3501(c) did not supplant the *McNabb-Mallory* rule but rather modified it). That statute creates a "safe-harbor" period of delay that is *per se* reasonable. Garcia-Hernandez, 569 F.3d at 1105.

9

Specifically, § 3501(c) states that a court may not suppress a confession made during a six-hour period solely due to delay in presentment if the confession was otherwise voluntary and if the weight to be given the confession is left to the jury. 18 U.S.C. § 3501(c).[1] See also Garcia-Hernandez, 569 F.3d at 1104. That safe-harbor period can be increased beyond six hours if the court finds that an extra delay is reasonable considering the means of transportation and the distance to be traveled to the nearest available magistrate. 18 U.S.C. § 3501(c). See also Garcia-Hernandez, 569 F.3d at 1104. In other words, the statute "provides immunization to voluntary confessions given within six hours of a suspect's arrest." Corley, 129 S.Ct. At 1564.

The application of Rule 5(a) and § 3501(c) requires a two-part analysis based on Corley. First, a district court must determine whether the defendant confessed within a six hours of arrest (and that six hours can be extended a reasonable amount considering the means of transportation and the distance to be traveled to the nearest available magistrate). Second, if the confession came within that period, it is admissible, subject to other Rules of Evidence, so long as it was a voluntary confession and so long as the weight to be given to the confession is left to the jury.

---

[1] 18 U.S.C. § 3501(c) reads as follows: "In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer."

10

But if the confession occurred before the initial appearance and beyond the six hour safety window (or longer given distance and transportation issues), the court must then decide whether delaying that long was unreasonable or unnecessary under the *McNabb-Mallory* cases. Corley 129 S.Ct. at 1751.

## B. Application of *McNabb-Mallory* rule to physical evidence

This Court notes that the *McNabb-Mallory* Rule suppresses confessions obtained during unnecessary delays. In this case, Felton seeks to suppress not only the statements he made during the delay in this case but also the consents he gave. Felton cites to United States v. Klapholz, 230 F.2d 494 (2d Cir. 1956) for the proposition that evidence other than a confession is subject to suppression for a violation of Rule 5(a). The Second Circuit in Klapholz reasoned as follows: "Since the rule was one formulated by the Supreme Court as a deterrent to detention in violation of Rule5(a), we think that it extends to all evidence obtained by federal agents through access to persons while detained in violation fo Rule 5(a)." No similar Ninth Circuit precedent has been cited by the parties or located by this Court.

The purpose of the *McNabb-Mallory* rule is to prevent officers from giving defendants the "third degree" and in order to enforce upon officers the presentment requirement. It acts as a deterrent. After a defendant is arrested and in custody, the main evidence derived from the delay will often be a confession. However, as this case demonstrates, sometimes officers will also obtain consents to search from a defendant during a delay. Both confessions and consents obtained because of an illegal detention under Rule 5(a) gives the Government an evidentiary advantage. This Court cannot reasonably conceive of why they should be treated differently given the deterrent purpose served by the *McNabb-Mallory* rule.

11

However, because the *McNabb-Mallory* rule serves the same deterrent function in the context of Rule 5(a) violations as the exclusionary rule serves in the context of Fourth, Fifth, and Sixth Amendment violations, this Court concludes that the exceptions to the exclusionary rule, such as the inevitable discovery exception, should also apply to the *McNabb-Mallory* rule. Under the inevitable discovery exception, the court may admit illegally obtained evidence if the evidence would inevitably have been discovered through independent, lawful means, such as by following routine procedures. United States v. Ankeny, 502 F.3d 829, 834 n. 2 (9th Cir. 2007).

## C. Miranda waiver as a Rule 5 waiver

Before this Court considers the application of the *McNabb-Mallory* rule, as modified by 18 U.S.C. § 3501(c) to the facts in this case, it must consider the Government's argument that the Miranda waivers signed by Felton also act as waivers of the prompt presentment requirement. It cites to United States v. Howell, 470 F.2d 1064, 1067 n.1 (9th Cir. 1972), United States v. Binder, 769 F.2d 595, 598 (9th Cir. 1985), *overruled on other grounds by* United States v. Morales, 108 F.3d 1031 (9th Cir. 1997) (en banc); United State v. Guthrie, 265 Fed.Appx. 478, 480-81 (9th Cir. 2008) ("A valid Miranda waiver also waives any Rule 5/Mallory claim."). None of these cases provide a detailed analysis as to why a Miranda waiver also permits the Government to withhold a defendant from a magistrate for an unspecified amount of time. Based on this Court's reading of the cases cited, it is not clear whether once a defendant waives his Miranda rights he not only agrees to a delay for the purposes of the interrogation but also agrees to let the agents continue to approach him hours after the interrogation is over and delay the arraignment without limitation.

Furthermore, upon close review of the case law on this issue, the Court has found cases

Case 3:09-cr-00124-RRB   Document 103   Filed 04/11/11   Page 12 of 22

that call this type of broad application of the *Miranda* waiver into doubt. In <u>United States v. D.L.</u>, 453 F.3d 1115 (9th Cir. 2006), the Government was only arguing that the defendant's Miranda waiver permits *a delay for interrogation* but the court stated that even if it permitted "a reasonable period of delay for purposes of interrogation, it would not excuse the additional twenty-one hour delay after interrogation was completed before [the defendant] was presented to a magistrate." <u>Id.</u> at 1124. In <u>United States v. Alvarez-Sanchez</u>, 975 F.2d 1396 (9th Cir. 1992), *rev'd on other grounds*, 511 U.S. 350 (1994), the defendant was arrested on a Friday. On Monday afternoon, he waived his Miranda rights. He was not arraigned until Tuesday morning. <u>Id.</u> at 1398, 1405. Despite the waiver of his Miranda rights, the Ninth Circuit proceeded to address the reasonableness of the delay. Similarly, in <u>Corley</u>, the defendant was arrested and was held more than nine hours before he executed a waiver. He was taken to a magistrate almost 30 hours after his arrest. Despite the fact that a Miranda waiver was given, the Court did not discuss the affect of the *Miranda* waiver on the Rule 5/§ 3501 analysis. <u>See</u> <u>also</u> <u>United States v. Pham</u>, 815 F.Supp. 1325, 1332 n.2 (N.D. Cal. 1993) ("The Ninth Circuit has stated repeatedly that a waiver of the *Miranda* rights *alone* constitutes a waiver of the rights secured by Rule 5(a) . . . . *Alvarez-Sanchez* casts doubt on the vitality of those cases.").

This Court concludes that Felton's Miranda waivers do not act as indefinite waivers of his Rule 5 prompt presentment rights. Given the case law discussed above, this Court finds that at most, the waivers allow some room for a reasonable delay for purposes of interrogation. Nothing in the statement of rights form he signed indicated he was waiving prompt presentment to a magistrate. This Court cannot confidently rule that the Miranda waivers given in this case resolve the issue and in and of themselves allow for these types of delays. It instead concludes

13

that prudence requires it to consider whether the delays were unreasonable and unnecessary.

**D. Reasonableness of delay**

In this case, it is undisputed that Felton's statements made on November 16, 2009 are admissible pursuant to Rule 5(a) and the prompt presentation requirements. He made these statements within a couple hours of being taken into custody at the airport and before his formal arrest.[2] Thus, they were made within the six-hour immunity period, and, as the Court concluded in its report and recommendation as to Felton's other motion to suppress at Docket 39, the statements he made were voluntary. So the statement is admissible pursuant to Rule 5 and 18 U.S.C. § 3501(c). The question is whether his statements and consents on November 17 and November 18 must be suppressed.

The safe-harbor period in this case is six hours. There is no need for this court to extend the safe harbor period of time for distance or transportation issues since the arrest took place in Anchorage. The statements and consents obtained on November 17, 2009 and November 18, 2009 are outside this six-hour window. Thus, pursuant to <u>Corley</u>, the Court must determine if the delays were unreasonable or unnecessary under the *McNabb-Mallory* rule.

The first part of the delay was due to the fact that he was taken into custody in the middle of the night. The overnight delay until 8:00 a.m. is reasonable. <u>United States v. Van Poyck</u>, 77

---

[2] The Government argues that the delay should be measured from the time Felton was formally arrested, which was 12:45 a.m. on November 17th, and not when he was taken into custody for interrogation, which was around 11:00 p.m. on November 16th. Based on the language of 18 U.S.C. § 3501(c) that provides immunity for confessions given within six hours of "arrest or other detention," it appears that it would be measured from the time Felton was detained at the airport for interrogation. However, the Court does not need to decide the matter because that detail is not dispositive, as the Court's analysis does not depend on whether he was held 36 hours like the Government contends or 39 hours like the defense contends.

14

F.3d 285 (9th Cir. 1996) (holding that "an overnight or weekend delay in arraignment due to the unavailability of a magistrate does not by itself render the delay unreasonable under § 3501(c)"). Therefore, this Court is really considering whether the delay from 8:00 a.m. on November 17 to his initial appearance at 1:33 p.m. on November 18 was reasonable and necessary.

There are a handful of factors that led to the delay of Felton's initial appearance. Based on the record, it is clear that the delay was not purposefully created in order to further interrogate Felton. Indeed, the agents promptly informed the clerk's office of the arrest the following morning. While the Supreme Court in <u>Corley</u> noted that a delay for the purpose of interrogation is the "epitome of unnecessary delay," this Court finds that other circumstances short of purposeful delay can lead to an unreasonable and unnecessary delay.

The record establishes that it took the entire day of November 17 to draft and file a complaint. There is nothing on the record to explain why it took so long, other than a representation by the Government attorneys during argument that they were deciding whether to proceed on an indictment or a complaint. But there is no evidence in the record to establish that fact. As the record stands, the complaint was not drafted, executed, and filed until around 5:00 p.m. on November 17. The record also establishes that a search warrant for Felton's Boston home had been prepared and executed earlier on November 17th, given that Agent Wauson went to the jail at 3:15 p.m. to talk to Felton about the silver suitcase found during that search. Thus, even if the Government had to first make a decision about whether to indict Felton or draft a complaint, the basis for the complaint had already been at least partially drafted that morning and so the full day delay for that process does not appear to be reasonable.

Case 3:09-cr-00124-RRB   Document 103   Filed 04/11/11   Page 15 of 22

The record also establishes that the initial appearance was not set until 11:30 a.m. on November 18 even though the complaint was filed at the end of the business day on November 17. Nothing on the record establishes why this time was set as opposed to earlier that morning. And nothing on the record establishes why the Court pushed back the initial appearance to 1:30 p.m. The Court is unable to reconstruct events from more than a year ago to fill in any details regarding the scheduling or the necessity of the initial appearance occurring at 1:30 p.m. rather than 8:30 a.m. or 9:00 a.m.

In <u>United States v. Garcia- Hernandez</u>, 569 F.3d 1100 (9th Cir. 2009), the delay in bringing the defendant in front of a magistrate was based on the fact that the border patrol office was busy that day. The facts in that case established that the border patrol officers were unusually busy that day in that they apprehended nearly five times as many people as they did on an average day. <u>Id.</u> at 1101. The officers apprehended the defendant at 4:00 a.m. but were unable to process him in the system until 5:00 p.m. that day. <u>Id.</u> at 1102. At about 11:45 p.m., after the agents were able to determine that the defendant was subject to criminal prosecution, the agents informed him of his Miranda rights and the defendant then made an incriminating statement. <u>Id.</u> The court upheld the lower court's denial of the Rule 5 argument, stating that the facts established that the delay was caused by a shortage of personnel necessary to process the defendant and determine whether he should be criminally charged. <u>Id.</u> at 1106. Such an administrative delay was reasonable and necessary.

There is no such administrative necessity present in this case. Nothing in the record suggests that there insufficient staff on duty to process Felton's complaint. Indeed, it is clear that there were three agents directly involved with Felton's Anchorage arrest. Nothing in the record

16

suggests it was unusually busy at the ICE agency or at the District Court in Anchorage.

Furthermore, while the delay was not purposeful, the agents seized the opportunity for further

questioning. This was not a case like Garcia-Hernandez where there was a long processing delay

and then at the end of the delay they read him his rights and obtained a statement. In this case,

there was already a valid interrogation of Felton on November 16, but the agents kept going back

to Felton during the delay to obtain further statements and consents to search from him, and they

did so after they had made comments to Felton about how some attorneys would only take his

money. They continued visiting the defendant to extract information without contacting the

Court or Clerk's Office to determine if an earlier Court time was possible.

    While the delay in this case is not the fault of any specific person or entity, this Court

cannot conclude that it was a reasonable and necessary delay.[3] And it is clear that this

unwarranted delay gave the agents an opportunity to extract more evidence from Felton before he

was able to hear his rights from a neutral magistrate.

    Because this Court finds that the delay after 8:00 a.m. on November 17, 2009 was

unreasonable and unnecessary, any evidence obtained on November 17, 2009 and November 18,

2009 as a result of the interrogations that occurred during the delay should be subject to

---

[3] During the hearing on this motion, the Government made reference to Miscellaneous General Order No. 08-05 (MGO). (Gov. Ex. 12). The Government cited to that order to reinforce its argument that its agents followed the procedure and to demonstrate that the setting of the initial appearance was beyond the Government's control. The order states that the clerk's office will schedule a hearing upon receipt of the notice of arrest, but it also states that "the arresting agency is responsible for taking the prisoner before the nearest available United States Magistrate Judge without necessary delay in accordance with Rule 5(a) of the Federal Rules of Criminal Procedure." Regardless, the MGO is not determinative of the issue as the Court finds that the agents did not purposefully delay the setting of the initial appearance but that all entities involved contributed to a delay that was unreasonable and unnecessary.

Case 3:09-cr-00124-RRB   Document 103   Filed 04/11/11   Page 17 of 22

suppression.  However, as discussed above, this Court finds that the inevitable discovery

exception applies.  Under the inevitable discovery exception, the court may admit illegally

obtained evidence if the evidence would inevitably have been discovered through independent,

lawful means, such as by following routine procedures.  United States v. Ankeny, 502 F.3d 829,

834 n. 2 (9th Cir. 2007).  In this situation, it is clear that the luggage Felton brought with him to

Anchorage (the checked bag and his backpack) would have been subject to an inventory search.

Agent Wauson testified that such a search would have been conducted as part of ICE's routine

procedures.  Therefore, evidence found during the search of Felton's backpack and suitcase is

admissible pursuant to the inevitable discovery exception.  And Felton had previously consented

to a search of his computer November 16, so information in his computer is admissible.

However, any statements obtained on November 17 and November 18, and the evidence derived

from the consent provided on November 17 to search a silver suitcase located in Felton's

apartment in Boston are not subject to any exclusionary rule exception and thus should be

suppressed.

## IV. RESPONSE TO OBJECTIONS

This Court submitted its initial recommendation at Docket 99.  The Government

submitted its objection at Docket 101.  In its objection, the Government argues that Felton's

Miranda waiver acted as a Rule 5 waiver.  It again argues that the application of a Miranda

waiver in such a manner is a well-established rule in this Circuit.  This Court has fully considered

the Government's argument a second time, but maintains its conclusion that Felton's Miranda

waiver was not tantamount to an indefinite waiver of the right to be brought before a neutral

magistrate.  While there are Ninth Circuit cases that summarily state that a Miranda waiver

constitutes a Rule 5 waiver, this Court has found no cases where such a Miranda waiver has been used to excuse this long of a delay where federal agents continued to question a defendant during the lengthy delay.  The Government cited to one published case where the facts make clear that the Ninth Circuit applied a Miranda waiver to excuse a very lengthy presentment delay and where the Court provides a discussion of the waiver issue–United States v. Mandley, 502 F.2d 1103 (9th Cir. 1974).  In that case, the court excused very long delay based on the fact that the defendant had waived his Miranda rights.  It concluded that the Miranda waiver also constituted a waiver of his prompt presentation rights.  However, the court was focusing, at least in part, on the concept of voluntariness of the confession based on an interpretation of 18 U.S.C. § 3501 that allowed confessions to be admissible even if there was a presentment delay of more than six hours as long as the confessions were voluntary.  That interpretation of 18 U.S.C. § 3501 was rejected in 2009 by the Supreme Court in Corely.  Therefore, the precedential value of that case is questionable.

In the initial report and recommendation, this Court relied on two cases that cast doubt on the Miranda waiver issue: United States v. D.L., 453 F.3d 1115 (9th Cir. 2006) and United States v. Alvarez-Sanchez, 975 F.2d 1396 (9th Cir. 1992).  It maintains its reliance on these two cases in this final recommendation.  As the Court's citation to Alvarez-Sanchez in the analysis above acknowledges and as the Government points out in its objection, the Supreme Court overruled Alvarez-Sanchez.  But it did not overrule it on the grounds that the Miranda waiver resolved the issue.  Instead the Supreme Court found that the Rule 5(a) presentation requirement had not been triggered upon arrest because the defendant was in state court custody.  United States v. Alvarez-Sanchez, 511 U.S. 350 (1994).

Case 3:09-cr-00124-RRB   Document 103   Filed 04/11/11   Page 19 of 22

The Government does not discuss United States v. D.L., 453 F.3d 1115 (9th Cir. 2006) in its objection. While the issue in the D.L. case involved the application of the Juvenile Delinquency Act's requirement that a juvenile be presented to a magistrate "forthwith," the Ninth Circuit's brief discussion regarding the Miranda waiver issue is nonetheless instructive. In that 2006 Ninth Circuit case, the juvenile defendant was arrested about 4:30 p.m. and eventually provided a Miranda waiver to the officers about two hours after his arrest. Id. at 1118, 1120. He was questioned that evening and then taken to a juvenile detention facility at about 9:30 p.m. He was arraigned at about 3:30 p.m. the next day, about 24 hours after his arrest. Id. at 1118-19. The Government in that case argued that the Miranda waiver given by the juvenile defendant allowed a delay for purposes of interrogation, and it cited to United States v. Indian Boy X, 565 F.2d 585 (9th Cir. 1977), one of the cases the Government relies on in its objection in this case. The Ninth Circuit rejected the argument: "Even if we were to permit a reasonable period of delay for purposes of interrogation, it would not excuse the additional twenty-one hour delay *after* interrogation was completed before [the defendant] was presented to the magistrate." D.L., 453 F.3d at 1124. This Court therefore maintains its recommendation that the issue not be resolved by relying on the Miranda waiver.

In addition to the fact there was a thirty-six hour delay of prompt presentation, the Government agents returned twice during that time to question Felton and seek consents to search. No notice was provided to the Court that immediate presentment was necessary and no explanation was provided why the consents to search were obtained in lieu of a warrant before opening the silver suitcase located in Felton's apartment. There is no Ninth Circuit precedent that rules a thirty-six hour delay, coupled with three interrogations and two approaches to obtain

20

consents to search are permissible. Should the Government's position and logic be adopted, the period of delay before presentation is limitless no matter how many times the defendant is again questioned by the Government agents.

The Government also objects to this Court's conclusion that the delay from 8:00 a.m. on November 17, 2009 to 1:30 p.m. on November 18, 2009 was unreasonable. Again, it stresses the portion of the delay that is attributable to the agents and argues that this portion was not deliberate or unreasonable. But this Court looked at the delay as a whole, not just those delays caused by the Government. Also, the Government asks the Court to assume that the scheduling of the initial appearance at 11:30 and then the rescheduling of it at 1:30 means that the delay was necessary for administrative purposes due to the Court's calendar or staffing. But nothing on the record supports that finding.

## V. CONCLUSION

Given the foregoing analysis, this Court respectfully recommends that Defendant's Motion to Suppress Statements of November 17 and 18, 2009 and Alleged Consents on the Same Dates, for Violation of Rule 5, Federal Rules of Criminal Procedure at Docket 33 is HEREBY GRANTED IN PART AND DENIED IN PART as follows: The Court recommends that Felton's statements made during his interrogations on November 17 and 18, 2009 and the evidence derived from Felton's consent on November 17 to search the contents of the silver suitcase in Boston should be suppressed. It recommends, however, that the evidence derived

/ /

/ / /

21

from the search of Felton's luggage and backpack be deemed admissible pursuant to the inevitable discovery exception and evidence derived from the search of his laptop computer be deemed admissible pursuant to his voluntary consent given November 16, 2009.

DATED this 11th day of April, 2011, at Anchorage, Alaska.

/s/ Deborah M. Smith
DEBORAH M. SMITH
United States Magistrate Judge

22